1-1-1-0-3 Adelman v. Branch, and we'll begin with Ms. Bishkin. May it please the Court, Counsel. My name is Jane Bishkin. I represent the defendant, Stephanie Branch. I'm requesting a five-minute rebuttal time. The issue before the Court today is whether Branch is entitled to be released on February 9, 2016, on dark property. Yes, ma'am. Ms. Branch? Yes, ma'am. She is. The reason we're here today is we believe the lower court failed to apply the proper qualified immunity analysis when it denied Branch's summary judgment qualified immunity defense as to whether Branch had probable cause to arrest Mr. Adelman for criminal trespass. That's clearly established law. You need to have probable cause. Yes, ma'am. We do not dispute that. And was Ms. Branch's authority to remove people from dark property just unfettered? No, ma'am. No, ma'am. So there is a fettering of it, if you will. There are some cabining of her authority. Yes, there are. And one cabining, whether she knew about it or not, was the photography memo. That's correct. However, as you know, in the Turner case, the right to photograph police activity was not clearly established on the date of the arrest. That's not what I'm talking about. I'm not talking about the First Amendment case. That's not before us. I'm talking about her authority to do what she did. Because if she did not have authority to tell him to leave, then his failure to leave is not probable cause for trespass. If I'm just walking down the street in New Orleans on the sidewalk, I'm not trespassing, even though I don't live in New Orleans. Okay? Somebody with authority has to tell me to leave, and then I have to refuse. Right? Yes, Your Honor. We agree. So if she lacked the authority, she didn't have probable cause, and a reasonable officer would not think that she had probable cause. Well, Your Honor, we believe she specifically had that authority to ask him to leave. She was an agent of DART Area Rapid Transit. Under Section 452 of the Texas Transportation Code, DART can establish rules and regulations regarding the use of DART-controlled property. And it did. And that included the photography memo, which takes away her authority. Again, regardless of whether, in general, you have an authority to photograph as a private citizen, in general, what the—this was—we're talking about DART authority. And that memo takes away her authority to do what she did, whether she knows about it or not. So how does she have authority? Your Honor, I would disagree with you. Because it wasn't clearly established, even with the authority, a police officer or any government agent does not lose their qualified immunity defense just because they violated some administrative statutes. No, I'm not talking about violating administrative—you're sidestepping what I'm saying. She has to have the authority to tell him to leave. You've agreed that's not unfettered. I'm saying that was restricted by DART. So she lacked the authority. Well, she believed that he was interfering under that same policy. That same policy doesn't give him unfettered right to take photos. He cannot be interfering with the police activity. That's where the video comes in and also disputed facts, at best for you all, disputed facts, on whether he was interfering. That's correct. So there's disputed facts about that. But a reasonable police officer would know at that time, and she didn't know because she was out sick, that there was a photography policy there. And because it wasn't clearly established at the time, she has to fall back on the DART policy, which is if you're not using the transportation services, you can be asked to leave by his own admission. It seems like you're picking which policies she ought to know about and ought to follow. I'm talking about a reasonable officer. Maybe she didn't know about it. That's fine. But a reasonable officer should know what the policies are that give them authority. And she lacked that authority. Now, if he was interfering with the CPR on a sick person, absolutely. But that, at best for you all, is a disputed fact issue. You'd agree with that. Well, we would. But we still believe that you can't rely on the policy. You have to rely on what a reasonable police officer, on transit authority, and the three states that cover this district. Not all of them are going to have a policy, a photography policy, especially back in 2016 when this occurred. It wasn't clearly established. No reasonable police officer would have been expected to know that he could take photos at that time. So that's where our analysis comes in. You have to look at the specificity of each case based on Escondido and Pollock. That's what I'm doing. I'm saying that, yes, a reasonable police officer should know their authority under their particular department. And she lacked that authority. Maybe in New Orleans you'd have that authority. Maybe in Jackson, Mississippi you'd have that authority. But in Dallas, Texas, she didn't have that authority, or the DART area, we'll say, DFW area. We believe she did have that authority. What about the other officers on the tape that can be heard saying that Edelman wasn't doing anything wrong? Why was she acting that way? That was only one officer. The other officer had not been trained on the photography policy, just as Ms. Branch had not been trained on the photography policy. She was out sick when it came out. She was trained after the fact. So she was unaware of the photography policy. Was she not provided a copy? She was not. She was out sick on a workers' comp injury. She had been back one month when this incident occurred. She was on maternity leave, no? No, ma'am. She had complications. She had broken her leg and had complications due to that. But, again, we still believe that under the Supreme Court's analysis of qualified immunity, if it wasn't clearly established that you had a right to photograph police activity, we still believe she had the authority to remove him under the specific policies and procedures of DART, which says if you're not catching the train, if you're not taking the bus, we can ask you to leave. Same thing for loitering. And if it wasn't clearly established that she could take photos, a reasonable officer under those same circumstances, we argue, would have probable cause to arrest Mr. Edelman because, by his own admission, even in his complaint, he admits he was asked to leave nine times. He refused to leave. And under that authority, if it wasn't clearly established that he could take a photograph at that time, she has to be able to rely on the existing law at the time. There's a Texas state case, Griffin v. State, came out in 2007, that says DART police officers have the authority to remove persons from DART property if they are not using transportation services. Again, Mr. Edelman has admitted in his complaint that this transportation— There's also Anthony v. State, a Texarkana Court of Appeals case, that says that you cannot—you lack authority to simply find somebody to be criminally trespassing in a city park when you don't have the authority to exclude somebody from the park. We feel like we can distinguish Griffin v. State. Griffin v. State was based on DART-controlled property, which is—they're promulgated under 452 of the Transportation Code. Anthony was just a city park. There were no regulations regarding people loitering or standing around in a city park. You're specifically allowed to do that in a city park. On DART, you cannot. You can't stand in front of a train or a bus and prevent it from moving. You and I may have to agree to disagree on the photography memo's impact on what you're saying. I don't think it has anything to do with whether a court has declared something as clearly established law. When you're talking about authority, if I give you authority to walk out that door right now, that's very specific to right now you that door. That doesn't give counsel opposite that authority or anybody else in the room if you need authority to walk out that door. So I just—I think we have to agree to disagree as to how somebody gets authority. Yes, Your Honor. Again, I know you understand that, but it specifically comes from the Texas Transportation Code because this property, especially this property— Right, but you give DART the authority to have rules, and it has them, and that includes the photography memo, whether she knows it about it or not. It's like there's a bunch of rules out in the world that we're all bound by that we may or may not know. But again, the qualified immunity analysis is she could have mistaken probable cause. She doesn't even have to have probable cause. As long as she had a good-faith belief that she had probable cause, she's still entitled to qualified immunity. There's still an objective standard on the good faith. Right. So if another police officer who was unaware of the photography policy, which one at the scene was, the record shows, then that person would probably—and that officer never said a word because presumably he believed that she had a right to ask him to leave the property if he was not using transportation services. So I would ask you not to consider an anecdotal situation where one officer may have been aware of the policy. The question is, would any reasonable officer be aware of that policy? And since it wasn't clearly established, our argument, of course, is that. I think you're conflating two or three different things, but that's fine. That's your argument. Your Honors, there have been five Fifth Circuit cases regarding criminal trespass that we've cited in our brief, one of which, of course, not Turner, but Griffin v. State specifically is a case. As I mentioned earlier, that's a Texas appellate court case out of Dallas, 2007. Officers arrested plaintiff for criminal trespass that was held to be lawful under the statute. Another case, Boston, that's a Fifth Circuit case from 1985. Mr. Boston was trying to gather signatures for a petition. He was on a grocery store parking lot or on the edge of a grocery store parking lot. The manager came out and asked him to leave. He said, I have a First Amendment right to be here. This is public property. I have a right to be here. The officers, the manager called the officers to come out. The officers arrested. The court said the officers were going to look at the exact, excuse me, the officers held that the officers in good faith had probable cause to arrest the individual for criminal trespass. Same at Skinner v. Skaggs, which is a 2016 court case from the Fifth Circuit, where this court ruled that probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude the suspect had committed or was committing an offense. Another Fifth Circuit case of 2010, Pena v. Bexar County, involving a man with a service dog in a courthouse. Officers arrested him for criminal trespass, not believing that the dog was actually a service dog. She had all this authority and did what was righteous. Why did she lie about it? She was found by her own in the investigation, the DART investigation, to have lied. Why would she lie if she was right? Well, she disputes adamantly that she lied. She was found by an investigation by DART, not your opposing counsel here, but DART, to have lied, and that is some indication. But, again, that goes to her subjective intent. Well, you've been relying on that all argument. It seems like her subjective intent was to lie. Well, I don't think we're relying on her subjective intent. You know, as you know, in Harlovers v. Fitzgerald, this is going to be an objective standard. Qualified immunity is an objective standard. So we can't consider her subjective. Well, you've repeatedly said she didn't know about this policy. Obviously, if she knew about the photography policy, you would have to make a different argument. Well, we still believe whether or not she knew about the policy, because it wasn't clearly established, we don't believe it should be considered for purposes of qualified immunity. What would a reasonable police officer in these three states believe if— No, what would a reasonable officer for DART believe about their authority under DART when DART has said you don't have authority? That, to me, is the question. It is the question, but I think you can't just consider DART. I think you have to consider all transit authority, because they have special rules that allow them to remove people who aren't using transportation services. I mean, DART, to be fair, is a little bit different than the typical, like, New York subway where you have to actually go through a gate and get in there and all that. I mean, DART is just sitting out there on the open, you're walking down the street right next to where the trains come up, and there is absolutely no barriers whatsoever. So even knowing what's DART property is a little— There are some stations that are more like a traditional station, but none of them have gates that you go through. That is true. You can't just show your pass or whatever, your iPhone, and show that you paid, and otherwise you don't go through the same processes. So this is a very unique, as far as I'm concerned, transit system from what I've seen. We agree, Your Honor. It is unique. And we believe she had the authority to ask him to leave, and we believe that that was reasonable under the situation. So we're asking you to reverse and remand this case back. Well, we're asking you to dismiss the claim against Ms. Branch on the Fourth Amendment claim of unlawful arrest under the Fourth Amendment. Thank you. You have reserved time for a vote. Yes, Your Honor. Thank you. May it please the Court, Tyler Bexley. I'm here representing the appellee and the plaintiff in the underlying action, Avi Adelman. The Fourth Amendment protects citizens from arrest without probable cause, and a police officer cannot circumvent that protection by giving an unlawful instruction to leave and then arresting a person for violating that unlawful instruction. What about this notion that this photography memo wasn't known by most, and therefore she had authority under the general principle that you shouldn't be on dark property, whatever that is, without waiting for a train or getting off a train? So three responses to that argument, Your Honor. First and primarily, it is undisputed that dark property is, in fact, public property. Just like the property in Anthony v. State, and one record site example of that is at page 1042, where the corporate representative for DART testified, quote, dark property is public property. And so it's exactly the same as the public park in the Anthony case that the Court brought up from the Texarkana Court of Appeals in that sense. So there's a difference, though, because as she pointed out, you have to be waiting for a train or having just gotten off a train in order to be on dark property, with the exception of this photographer putting aside the photography memo. So it's not like a city park where you just can hang out. So the code of conduct provision that DART or that Officer Branch relies on for that proposition specifically uses the word unauthorized being on the property, and there is testimony in the case, and as the Court has pointed out, that the photography policy is a enumerated authorized exception to the policy. So the very existence of that photography policy takes Mr. Edelman out and any other person out of that, quote, unquote, unauthorized use provision of the code of conduct. Am I right in you don't have to pay to get onto the dark property? It's only to get on the train. And there, again, you're not physically paying. Like, say, in a New York subway station, you have to go through the gate long before you're ever at the train, and that's when you have the ticket or whatever. You go through the gate, and you're not even close to the train at that point. In Dallas, you're standing there on, you know, Ackerd Street, and the train's right there, and if you don't get on it, nobody's going to arrest you for having failed to pay, correct? That is absolutely correct with respect to Rosa Parks Plaza where Mr. Edelman was arrested. I wouldn't want to speak on behalf of DART as to whether that's true at every one of the stations, but at most of them, and certainly at the one at issue here, that is correct. I've never seen a DART station that you had to pay to get into the station. Nor have I. Once you're on the train, you should have paid, but it's something of an honor system unless and until an officer actually accosts you. Right. That's my understanding. And the final issue I want to point out on this knowledge of the photography policy is that the standard, as the court pointed out and as counsel pointed out, is an objective one, and that's straight out of Anderson v. Creighton from the U.S. Supreme Court. It tells the courts, lower courts, not to look at the subjective state of mind and intent of the individual officer. So what if DART passed this photography policy and never told their officers? Would that still be a hamper on their authority, and therefore it would still be unreasonable for them to think they had probable cause in this circumstance? I think it probably would, and here's why. Because in any case, including this case, then the municipality, DART, can get up and say, Well, we have a policy. You can't bring a Monell claim against us. We wash our hands of it. Blame the individual officer. And then the individual officer says, Wait a second. I don't know about the policy. I have qualified immunity. And suddenly every plaintiff has been stuck between a rock and a hard place of a municipality washing their hands under Monell because they have a clean policy that's not unconstitutional, and then the individual officer raising the qualified immunity defense, and you could sort of use that to circumvent ever holding anybody accountable for violating constitutional rights. And I do want to raise one very important point on this knowledge of the photography policy also. Whether or not the officer branch knew about the photography policy is a disputed issue of fact that has yet to be resolved. And under the Fifth Circuit's case law, the defendant in an interlocutory appeal like this one is required to concede the best version of the facts to the plaintiff and argue only issues of law. And just to give some record sites that indicate that dispute, you have page 915 and 916 where the chief said that he posted the policy on the bulletin board where all the officers eat as well as in a glass case outside of his office in two separate places and also made it available on some sort of electronic drive that I believe the officers had access to. That's all on pages 915 and 916. When she got back from her workers' comp situation, she's sitting in the cafeteria eating. She could look up and see the policy. Correct. She didn't have to be there when it came out. Correct. And I understand from some of the other testimony, for example, Officer Craig, who was one of the other officers at the scene, that it's a regular practice for the officers to look at, to see things up on a bulletin board in what's called the chief's corner where regular announcements are posted. That comes from page 430 in the record. And then as well, Chief Spiller testified in his deposition on pages 920 and 921 of the record that he personally believes that the policy was properly distributed to his officers. And so you have a corporate representative of DART and the police chief saying, I distributed it, I put it up where I usually put it up, and then you have an officer saying, well, I didn't see it. I believe that creates at least an issue that a reasonable juror could conclude otherwise. But if it's an objective standard, then the question is, would a reasonable officer know about it? I agree, and I'm only pointing this out to the extent that the court is crediting this notion that her lack of knowledge, subjective knowledge, is somehow relevant to the inquiry. If, as I agree, the court were to find that you don't even look at that, you look only at the objective officer. Well, if a reasonable officer wouldn't know about it and she did, then it wouldn't matter. Agreed. If a reasonable officer would know about it and she didn't, it doesn't matter if it's an objective standard. I agree, and so I think that's what makes that testimony by the chief particularly compelling and illustrative here when he said he followed his standard policy of putting it up on the board, putting it up where they eat lunch in two separate places, and putting it up on a drive, and he's comfortable that the policy got out. I think the only conclusion that flows from that is a reasonable officer should have known about the policy and should have known that the policy cabined her authority. And against that backdrop, I think that that distinguishes all of the cases that counsel cited both here at argument as well as in the briefing. Every single one of those cases follows the same sort of fact pattern where a third-party owner of property, whether it's a shopping mall, a grocery store, a bar, has given an instruction to a person to leave that property. That instruction was not followed, and then the third-party owner calls the police or notifies a nearby off-duty officer and says, will you please arrest this person for trespassing on our property? In those cases, the Fifth Circuit, for example, in the Bodzin case, said, yes, it is reasonable for an officer to believe he has probable cause to make an arrest because a third-party owner has come and asked the police officer and told the police officer that I asked this person to leave my property. In Bodzin, the court says it wouldn't be fair for a police officer to be held to standards of doing research on where public property starts and private property ends and the meets and bounds of property while out on the job, and therefore found qualified immunity there. What is a clearly distinguishing fact here is that it is the very same person giving the instruction to leave the property and then making the arrest for the failure to follow that instruction. And that is why, as Judge Haynes, you pointed out during Counsel's argument, the critical question here is whether Officer Branch was authorized to make that instruction at the outset. If she was not, then that puts us firmly within the Anthony v. State case where the police officer ordered Mr. Anthony out of the park and then arrested him for criminal trespass and the court said, because the arresting officer lacked authority to exclude a person from the park, the evidence is legally insufficient to support the effective consent of criminal trespass. Because of that, we are not in Bodzin. We're not in the Grad case that was cited. We are in a different case completely that actually is more analogous to the Turner case that Counsel— If I tell you to get off of my property at my house and you won't and I call the police and then they arrest you, that's the other cases. Right. And that's understandable that a police officer is not being expected to referee a dispute between — a civil dispute between neighbors or where a property line ends. That would be an unreasonable expectation of a police officer, versus it is quite reasonable to expect a police officer to follow the policy cabining their authority to order people off of public property, which is the Anthony case as well as what we have here. And I would note also that the penal code, Section 30.05, specifically anticipates or requires that the person making the instruction to leave had authority to make that instruction. And so if the person didn't have the authority, then there would not be probable cause to find that an offense occurred under the penal code statute. Now, switching gears a little bit, I'd like to address the issue of whether Turner v. Driver applies to provide some sort of additional clearly established protection outside of the photography policy. Counsel's argument was that because the right to photograph was not clearly established under Turner v. Driver at the time of the arrest, that this Fourth Amendment right for some reason also was not clearly established to that. But Turner actually answered that question inside of the Turner case itself. The Turner court allowed a Fourth Amendment claim on lack of probable cause to go forward at the motion-to-dismiss stage, and thus implicitly found that the mere fact that the Turner decision, as well as at the time of Mr. Edelman's arrest, does not mean that a person arrested for recording police lacks a remedy under the Fourth Amendment. That Fourth Amendment claim was sent back and presumably is still percolating through. I don't know what ultimately happened, but was sent back to be tried as to whether the officer violated the probable cause standards of the Fourth Amendment. And Turner is instructive because in Turner, the court or the police officers arrested a person for recording police and then charged him with the offense of failure to ID. And the Turner court said, well, you can't be held liable for failure to ID if the arrest was improper in the first place. You aren't required to show your ID. You can analogize to the case here where if Mr. Edelman, if Officer Branch did not have authority in the first instance to order Mr. Edelman off the property, then she also did not have probable cause to make an arrest when he did not leave the property. And to say that you need a clearly established underlying right as such as the First Amendment in order to make an arrest without probable cause improper under the Fourth Amendment simply has no basis in the law. Take, for example, similar to the hypothetical you gave earlier, Judge Haynes, a person — an officer sees his or her neighbor who he's currently feuding with approach dark property and walk onto property, suddenly says, I don't like this guy, I'm going to order him off the property, and then when he refuses, I'm going to arrest him. There's not a constitutional protection necessarily to — because you're a feuding neighbor, you have some heightened, clearly established protection. You simply did not have probable cause in the first instance or authority in the first instance to order that person off of the property, and therefore you don't have probable cause to arrest that person. If it's not my property, is that what you're saying? If it's — I have authority to order people off my property even if I'm being rude, right? I'm sorry. I may have been confusing. My hypothetical was if a police officer is feuding with somebody and tells them to leave dark property because they don't like the person who's coming on property or they don't like the color of the T-shirt he's wearing or pick any hypothetical, just because it's not based on some clearly established right, like the right to photograph, that doesn't mean that the arrest had probable cause. That is completely separate inquiries, and the two should not be conflated. So I want to come back to this issue that the standard we're looking at is whether a reasonable officer would have made the arrest. All of the evidence in the record here that was submitted at summary judgment and that Judge Shuller considered in making her decision establishes at least a fact issue as to the reasonableness of the conduct. Just a few examples. You have an internal affairs report, which is in the record at page 1049 and 50, where the internal affairs investigator specifically applied the reasonable standard person and concluded, quote, Adelman was not breaking any laws and would not lead a reasonable person to believe that he was committing a crime or had committed a crime or was about to engage in committing a crime. Therefore, the arrest of Adelman for criminal trespass was not based on sufficient probable cause. That's a finding that was made using the reasonable person standard that is in the record and that Judge Shuller considered in finding at least a fact issue, and that shows the reasonableness or lack of reasonableness of the arrest here as well. The internal affairs report also undermines this notion that a reasonable officer would have thought Mr. Adelman was somehow interfering with the medical scene and was getting too close. The video shows that clearly to any objective person looking at it, including the court. If you were to watch it, you would be able to see that, I think. And then the internal affairs report specifically says he was never viewed within ten feet. At least a fact issue about whether he was interfering. Exactly. He was never viewed within ten feet. The other officers at the scene, you can pick up comments saying they're wondering why she's approaching him. They don't view him as a threat. They don't view him as interfering. The Dallas Fire Rescue Paramedics representative provided a statement to the internal affairs investigation saying our officers never viewed him. Is there any indication that she knew him before? No. I think it's undisputed that she did not. And said our officers didn't ask Officer Branch to move him, didn't say he was interfering, didn't view him as interfering. That's all in the same record site as the internal affairs report in the range of 1049, 1050 in the record. You have her own police chief and the corporate representative for DART says in his deposition, quote, Officer Branch's arrest of Mr. Adelman was an illegal arrest without probable cause. That's in the record at page 1035. All of the evidence creates at least a fact issue on that. And so really the only thing that the court is looking at here is whether she had authority to make that instruction in the first place. And I would submit that all of the evidence, both the photography policy, the Turner versus Driver analysis, the Anthony versus State analysis, and the penal code language itself makes clear that she doesn't. And I also want to lastly address this point that there's a Dallas Court of Appeals case in the state that counsel referred to as creating some sort of different standard with respect to DART. That case is an unpublished disposition that does not, it's procedural in nature and does not address the substantive issues in this case. The specific holding of the court there was, quote, Appellant does not challenge the legal or factual sufficiency of the evidence to support his conviction, close quote. And they went on to find that the appellant didn't properly raise a And so to claim that this unpublished authority created some sort of different standard applicable to DART, particularly when the evidence in the record makes clear that DART property is public property is simply not the case. Mr. Bexley, quick question. Assuming we agree with you that Judge Schoeller properly denied summary judgment on QI, she flagged generally kind of disputed material fact issues, didn't really inventory or catalog them. So assuming we agree with you that QI was properly denied at this stage, is it best for us to remand and let her kind of scour the record or for us to do that spade work as a court of appeals? I would submit she'd probably consider that, certainly, and wouldn't have made that decision without doing so. But I suppose I would advocate for her to get the first chance as a district court if the court believes that there's some additional findings of fact or conclusions that needed to be made at the lower court to support that. It's probably better to let Judge Schoeller as the district court have the ability to go through the record and do that. Again, I believe she probably did or wouldn't have rendered the decision that she did, but if there's some additional information that should have been in the opinion, I would suggest that it go back to her. Well, the law allows us to either scour the record ourselves and determine what the fact issues are or to remand it to the district court in the first instance. Of course, if we conclude that as a matter of law she lacked authority and therefore could not have reasonably thought she had probable cause, then I guess there isn't anything to remand on that. Then you just remand for trial. I agree. That's a legal issue that obviously this court has the prerogative to find, and that would obviate any need to go further into the record. But if we're confused about what the fact issues are that the judge found, would it be your position that we should find them or that we should send them back to her? I don't know that I have a strong preference. I suppose because she's the trial judge, maybe she should get the chance to do that, although I know you have the authority to as well. And we've cited all the reasons in the record why we think that's supported, so I think it could be done at this level as well. The very last issue with my last two minutes I'd like to just very briefly get into is this separate issue of punitive damages that was raised in the appeal. I would submit that the collateral order doctrine does not provide this court with jurisdiction to decide that. So she has QI. She has it to the whole thing, including punitive damages. Absolutely. Only if we were to conclude no QI that the issue of whether we have authority to look at the punitives matters. Yes, that's correct, Your Honor. I would say the court does not because the collateral order doctrine is very limited. There's a Tenth Circuit case called Farhat v. Bruner that specifically found that punitive damages in this type of context are not part of the collateral order doctrine. And on top of that, all of the findings on why punitive damages could go forward was based on sufficiency of the evidence, which is not appropriate for interlocutory appeal of a qualified immunity. So for all of those reasons, Mr. Adelman, the appellee, requests that the court affirm Judge Scholar's summary judgment in denial. Thank you. Ms. Bishkin, you have reserved time for rebuttal. Just briefly, Your Honors. Again, starting with the proposition that we believe that because it wasn't clearly established that one could take photos of police activity, that Ms. Branch is entitled to qualified immunity on the unlawful arrest. Now, recall that under the qualified immunity analysis, the qualified immunity attaches when the official's conduct does not violate clearly established statutory or constitutional rights, which a reasonable person would have known. That's White v. Polley. We believe that under Freeman v. Gore, which is a Fifth Circuit case out of 2007, courts cannot ignore the qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who violate the law. So our argument that she may, whether or not under these facts, a reasonable police officer would have believed he had probable cause, we believe that especially since not all police officers that work for DART in this case had notice of the photography policy, that Ms. Branch could have had either probable cause or good faith belief of probable cause or mistaken probable cause. We believe, we argue in this case, that she did in fact have probable cause to make the arrest. Again, not to belabor the point, but that because a reasonable police officer did not know at the time that photographing police was clearly established, that Ms.  We believe she had the authority under 452 of the Transportation Code to order Mr. Adelman off the property because by his own admission he was not using transportation services. Thank you.